# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRIS PAGNANI MD PC d/b/a ) <br> RITTENHOUSE PSYCHIATRIC ASSOCIATES ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THOMAS SCARY, M.D., ) <br> ) <br>     Defendant. ) | Civ. A. No. 2:25-cv-6837\_\_\_\_ <br><br><br><br><br><br><br><br><br> December 4, 2025 |

## VERIFIED COMPLAINT

Chris Pagnani MD PC d/b/a Rittenhouse Psychiatric Associates ("RPA" or "Plaintiff") brings the following Verified Complaint for injunctive relief and damages against Thomas Scary, M.D. ("Dr. Scary" or "Defendant") and avers as follows:

## PRELIMINARY STATEMENT

1. RPA brings this action to protect its trade secret and confidential patient information and to enforce the terms of Dr. Scary's Independent Contractor Agreement (the "IC Agreement") and its incorporated Confidentiality and Non-Solicitation Agreement (the "Covenant Agreement"), both of which were signed by Dr. Scary in connection with his engagement with RPA on November 26, 2024. True and correct copies of the IC Agreement and the Covenant Agreement are attached hereto as Exhibits 1 and 2, respectively.

2. Through the IC Agreement and the Covenant Agreement, Dr. Scary agreed to refrain from (a) soliciting RPA patients and employees during his engagement with RPA and for two years following termination of his engagement; (b) providing services or operating another outpatient fee-for-service private practice of psychiatry and/or psychology while engaged by RPA;

and (c) using or disclosing RPA's Confidential Information (as that term is defined in the Covenant Agreement) other than for the purpose of performing services to RPA.

3. On November 18, 2025, Dr. Scary gave ninety (90) days' notice to RPA that he would be terminating his IC Agreement in order to start his own competing private psychiatry practice.

4. Despite acknowledging the valid and reasonable restrictions in his IC Agreement and Covenant Agreement, Dr. Scary immediately began soliciting RPA's patients, including by sending a solicitous and unapproved e-mail to all patients he was then treating on behalf of RPA (after RPA expressly told Dr. Scary that RPA would handle informing patients of his departure and their transition to a new provider, to avoid confusing messaging), and by launching a website offering immediate availability for fee-for-service psychiatry services outside of RPA.

5. To engage in his improper solicitations, Dr. Scary is misusing his knowledge of and access to RPA's trade secrets, including the names and contact information of patients he serviced on behalf of RPA. Dr. Scary continues to freely use RPA's trade secrets to effectuate an ongoing campaign of solicitation.

6. RPA has attempted to resolve this dispute prior to seeking Court intervention, including by demanding that Dr. Scary, *inter alia*, remove or modify his website to direct patients to RPA and stop misappropriating RPA's trade secrets. However, in response Dr. Scary made it clear that he intends to continue to breach his contractual and statutory obligations.

7. RPA brings this action to prevent further patient confusion, related irreparable harm to its business reputation and goodwill, and pecuniary losses, and to enforce the terms of Dr. Scary's IC Agreement and Covenant Agreement.

## PARTIES

8. RPA is a Pennsylvania professional corporation with its headquarters located at 30 S. Valley Rd., #101, Paoli, Pennsylvania 19301.

9. Dr. Scary is an adult individual who, upon information and belief, resides at 717 Hampton Rd., Ambler, Pennsylvania 19002.

## JURISDICTION AND VENUE

10. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because RPA brings a claim pursuant to the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, *et seq.* This Court also has supplemental jurisdiction over RPA's remaining claims pursuant to 28 U.S.C. § 1367 and 15 U.S.C. § 1125 because the claims form part of the same case or controversy as RPA's federal question claim under the DTSA.

11. This Court has personal jurisdiction over Dr. Scary because he is a citizen and resident of the Commonwealth of Pennsylvania.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because it is a district within which a substantial part of the events or omissions giving rise to RPA's claims occurred.

## FACTS COMMON TO ALL COUNTS

### *RPA's Business*

13. RPA is a Paoli, Pennsylvania-based private practice of approximately twenty-five (25) Psychiatrists, Psychiatric Nurse Practitioners, Psychologists, and Psychotherapists providing outpatient psychiatry and psychology services to patients throughout the United States from offices in Pennsylvania, New Jersey, Delaware, and New York.

14. RPA invests substantial time, money, and resources in centrally developing, marketing, and promoting its practice offerings, including by advertising the practice's services,

enhancing practitioner's visibility, and investing substantially in patient retention. These investments directly contribute to the goodwill, reputation, and competitive position of RPA, as well as to the patient base from which its providers benefit.

15. In consideration of these significant expenditures and efforts, to which its providers do not directly contribute, financially, RPA requires its employed and contracted providers to agree to reasonable non-solicitation and non-disclosure covenants designed to protect RPA's legitimate business interests, including its investments in patient acquisition, marketing, and reputation. Such provisions are standard and necessary to prevent the improper diversion of patients and goodwill that RPA has cultivated through its own resources and efforts.

16. In addition, in order to protect its trade secret patient information—which is the lifeblood of RPA's practice—RPA utilizes multiple layers of physical, technical, and administrative safeguards. RPA restricts access to its offices and clinical areas, limits system credentials to authorized personnel, utilizes HIPAA-compliant online storage, and grants access to electronic records and other patient information only to those who have a legitimate need to use such information in the course of performing their duties on behalf of RPA.

17. RPA further maintains password-protected, advanced security electronic health record ("EHR") systems and utilizes encryption and secure remote-access protocols. RPA also requires its personnel to comply with HIPAA standards and confidentiality policies.

18. The above-described protections are essential to securing RPA's confidential and proprietary patient data, maintaining regulatory compliance, and safeguarding the goodwill and competitive advantages that RPA has built through its own investments and effort.

### *Dr. Scary's Engagement with RPA and His Contractual Obligations*

19. Dr. Scary joined RPA in 2022.

20. On November 26, 2024, in connection with the renewal of his relationship with RPA, Dr. Scary signed the IC Agreement and the Covenant Agreement.

21. Pursuant to Section 3(c) of the IC Agreement, Dr. Scary agreed that during his engagement with RPA, he was free to perform outside services. However, Dr. Scary agreed that he would not "provide services to or on behalf of, support, operate, or otherwise be engaged by another outpatient fee-for-service private practice of psychiatry and/or psychology" while engaged by RPA. *See* IC Agreement, Ex. 1, at § 3(c).

22. Further, pursuant to Section 2(k) of the IC Agreement, Dr. Scary agreed that upon giving notice of termination of the IC Agreement, RPA would contact Dr. Scary's patients to transition them to another provider within RPA, as follows:

> Prior to termination of the Agreement, Contractor agrees to write a summary of care or transition of care note and to transition all patients to another provider within RPA, as directed by RPA. Contractor understands that RPA may also reach out to RPA's patients that Contractor provides services to directly, for the same purposes, including to schedule them with a different RPA provider and cancel future appointments with Contractor, within 90 days of Contractor's anticipated last day at RPA. Accordingly, RPA is not responsible for any decrease in the contractor's income prior to their last day, secondary to RPA exercising its rights under this sub-section including by cancelling and/or transitioning patient appointments to a new provider. If any patient is not agreeable to transitioning to another provider within RPA, Contractor is responsible for providing said patient with adequate information on obtaining a new provider in the community with at least 90 days' notice.

*Id.* at § 2(k).

23. Dr. Scary also agreed that during his engagement with RPA and for a period of two (2) years following termination of the same, he would not solicit RPA's patients as follows:

5

      (i)      Contractor acknowledges that as a result of Contractor's engagement with the Practice, Contractor will be acting as a representative of RPA and will be using the Practice's assets and resources, and will be benefiting from RPA's goodwill, name recognition, reputation, and experience, and Contractor will gain Confidential Information about RPA Patients. In order to protect the Practice's legitimate business interests, Contractor agrees that during the Restricted Period, Contractor shall not, directly or indirectly, solicit any RPA Patient for the purpose of (A) providing or selling services or products of a nature being provided or sold by the Practice, or (B) entering into or seeking to enter into any contract or other arrangement with any RPA Patient for the performance or sale of services or products of a nature being provided or sold by the Practice. Contractor's agreement "not to solicit" as set forth in this Section 2 means that Contractor will not, directly or indirectly, initiate any contact or communication with any RPA Patient for the purpose of soliciting, inviting, encouraging, recommending or requesting any RPA Patient to do business with Contractor and/or a Competitor in connection with the performance or sale of services and products of a nature being provided or sold by the Practice.

      (ii)     During the Restricted Period, Contractor shall not, directly or indirectly, engage in any conduct intended or reasonably calculated to induce or urge any RPA Patient to discontinue, in whole or in part, his/her patronage or relationship with the Practice.

*See* Covenant Agreement, Ex. 2, at § 2(a).

24. Through the Covenant Agreement, Dr. Scary further agreed not to use or disclose RPA's Confidential Information (as that term is defined in the Covenant Agreement), except in the course of performing services for RPA. *See id.* at § 1.

25. On November 18, 2025, Dr. Scary gave notice to RPA that he was terminating his IC Agreement effective February 16, 2026.

26. As of the date he provided notice of his termination, Dr. Scary was actively treating approximately 225 RPA patients. For the most part, Dr. Scary did not bring these patients to RPA.

6

Instead, RPA entrusted Dr. Scary with existing patients by assigning him to treat those patients whom he agreed to treat.

27.     Indeed, because Dr. Scary had difficulty filling his own patient roster, RPA's Medical Director, Dr. Christopher Pagnani, M.D., transferred a large number of his own patients to Dr. Scary in 2023. RPA also assigned to Dr. Scary new intake patients who called into RPA's main hotline or who were referred to RPA by other providers.

28.     The RPA patients seen by Dr. Scary as of the date he provided his notice represent hundreds of thousands of dollars in annual revenue.

### *Dr. Scary Breaches His Contractual Obligations*

29.     Upon receiving Dr. Scary's notice of departure, RPA promptly reminded Dr. Scary of his contractual obligations, including his duty to assist in the orderly transition of patients to other RPA providers, his two-year restriction against soliciting RPA patients, and his prohibition against operating a fee-for-service private practice prior to his final day at RPA. A true and correct copy of RPA's correspondence to Dr. Scary is attached hereto as Exhibit 3.

30.     RPA further informed Dr. Scary it would be contacting his patients to schedule them with alternative RPA providers and to cancel any upcoming appointments they had already made with Dr. Scary. *See id.* RPA also instructed Dr. Scary to forward any patient inquiries he received to RPA to avoid confusion and to ensure continuity of care.

31.     Consistent with these communications—and in order to safely and appropriately transition patients—RPA notified Dr. Scary's patients of his impending departure and reassigned many of them to other qualified RPA providers.

32.     Shortly thereafter, RPA began receiving reports from patients indicating that Dr. Scary had independently sent out a separate communication stating that he would remain available

7

to continue working with patients at RPA until February 2026. RPA did not review, authorize, and approve this communication before it was disseminated.

33. As expected, the conflicting messages from RPA and Dr. Scary caused significant confusion among patients regarding the status of their current and future care.

34. To mitigate this confusion, RPA requested that Dr. Scary provide a copy of the communication to patients, as well as a list of the recipients. Dr. Scary refused to comply with these reasonable and necessary requests.

35. RPA later learned--through Dr. Scary's counsel--that his message, or at least one version thereof, went beyond merely notifying patients of his departure and instead improperly invited discussions regarding their ongoing care with him. The message stated:

> *"Hello, I am writing to inform you that I will no longer be practicing at RPA as of February 16, 2026. This message serves to give you ample notice of my departure, and the opportunity to discuss your care moving forward at our upcoming appointments. Until then, feel free to reach out with any clinical concerns as usual. Take care, and have a happy holiday season."* [1]

36. Dr. Scary improperly used RPA's trade secret patient information to send this solicitous communication, which was deliberately crafted to invite patients to discuss future care with him and to divert them to his forthcoming competing practice. This conduct directly violates the confidentiality and non-solicitation provisions of the Covenant Agreement.

37. Compounding this misconduct, RPA subsequently discovered that Dr. Scary had launched a website advertising competing fee-for-service outpatient psychiatric services, with immediate availability.

---

[1] Tellingly, and despite including a welter of other communications, Dr. Scary's counsel did not provide a copy of this correspondence but merely quoted it in his correspondence to RPA's counsel in response to RPA's formal demand that Dr. Scary cease his unlawful activities.

38. When RPA demanded that Dr. Scary remove or modify the website to direct all patient inquiries to RPA—because the website constituted a clear breach of Section 3(c) of his IC Agreement—Dr. Scary refused to comply.

39. Instead, in a transparent attempt to circumvent his contractual obligations, Dr. Scary altered the website to state that he would be offering *free* fee-for-service outpatient psychiatry services until February 16, 2026, again with immediate availability to start seeing patients.

40. Dr. Scary's conduct constitutes a blatant and ongoing breach of his IC Agreement, as he is actively competing with RPA while still engaged as its contractor.

41. His actions further violate the Pennsylvania Unfair Trade Practice and Consumer Protection Law ("UTPCPL") because they are deceptive, misleading, and create substantial confusion among patients who were appropriately notified of his departure and transitioned to other RPA providers.

### *RPA Is Entitled to Injunctive Relief*

42. By virtue of the foregoing, RPA has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against the Dr. Scary.

43. Unless Dr. Scary is enjoined from his wrongful conduct, RPA will be irreparably harmed by:

   (a) Disclosure and misuse of trade secrets, patient information, and/or other confidential information and intellectual property that is solely the property of RPA and its patients;

   (b) Solicitation of RPA's patients; and

(c) Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

44. RPA has no adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Contract

45. RPA hereby realleges and incorporates by reference the preceding allegations as if fully set forth at length herein.

46. Dr. Scary's IC Agreement and his Covenant Agreement are valid contracts supported by adequate consideration.

47. RPA has performed all material obligations required of it under the IC Agreement and the Covenant Agreement.

48. Dr. Scary breached the IC Agreement by advertising and operating a competing fee-for-service private practice of psychiatry while still engaged by RPA.

49. Dr. Scary breached the Covenant Agreement by improperly soliciting RPA patients to his new private fee-for-service psychiatry practice.

50. As a direct and proximate result of Dr. Scary's conduct, RPA has suffered and will continue to suffer actual damages and loss, including loss of valuable and substantial business and patient relationships; loss of the benefit of its contractual bargains; loss of profits and future profits; and other damages, all of which are ongoing.

51. Unless Dr. Scary is temporarily, and thereafter preliminarily and permanently, enjoined from the foregoing conduct, RPA will be irreparably harmed by disclosure of its trade secret and confidential information, loss of goodwill, loss of confidence and trust of patients, and

loss of business reputation, in addition to potential future economic loss, which is presently incalculable.

52. Thus, RPA is entitled to temporary and preliminary injunctive relief, as well as monetary damages, together with an award of attorney's fees and costs, and other relief this Court deems just and proper.

**COUNT II**
**Misappropriation of Trade Secrets**
**Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*)**

53. RPA hereby realleges and incorporates by reference the preceding allegations as if fully set forth at length herein.

54. RPA's patient data, including patient names and contact information, as well as additional information such as patients' medical needs, preferences, and objectives, are trade secrets subject to protection under the DTSA.

55. This information derives independent economic value by not being accessible through proper means to competitors who can profit from its use or disclosure. The identities of RPA's patients are not readily available to the public or to RPA's competitors.

56. RPA has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including requiring computer access passwords to be used to access RPA computer systems and records, implementing two-step verification procedures to safeguard confidential patient information, and having employees and contractors, including Dr. Scary, sign agreements which require adherence to HIPAA regulations and expressly prohibit the use, removal, and disclosure of such information outside of RPA.

57. The conduct described above constitutes an actual and threatened misappropriation of RPA's trade secrets.

11

58. Dr. Scary has willfully and maliciously used and exploited RPA's trade secret patient information for his own benefit and without RPA's consent.

59. Dr. Scary engaged in this conduct despite acquiring this information under circumstances involving a relationship of trust giving rise to a duty to maintain the information's secrecy and limit its use. Indeed, he contractually agreed to maintain that confidentiality.

60. As a consequence of the foregoing, and for the reasons detailed above, RPA has suffered and will continue to suffer substantial harm and loss.

61. Thus, RPA is entitled to temporary and preliminary injunctive relief, as well as monetary damages, together with an award of attorney's fees and costs, and other relief this Court deems just and proper.

## COUNT III
## Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law
## (73 P.S. § 201-1, *et seq.*)

62. RPA hereby realleges and incorporates by reference the preceding allegations as if fully set forth at length herein.

63. By virtue of the acts and omissions set forth in detail above, Dr. Scary has engaged in unfair methods of competition and unfair or deceptive acts or practices that create a likelihood of confusing or of misunderstanding for RPA's patients.

64. Dr. Scary engaged in such acts or omissions for the sole purpose of inflicting harm on RPA or to benefit himself at the expense of RPA.

65. Dr. Scary's conduct is contrary to honest business and commercial practices.

66. As a result of Dr. Scary's conduct, RPA has suffered and will continue to suffer actual damages and loss, including loss of valuable business and patient relationships; loss of the

benefit of its contractual bargains; loss of profits and future profits; and other damages, all of which are ongoing.

67. Unless Dr. Scary is temporarily, and thereafter preliminarily and permanently, enjoined from the foregoing conduct, RPA will be irreparably harmed by disclosure of its trade secret and confidential information, loss of goodwill, loss of confidence and trust of patients, and loss of business reputation, in addition to potential future economic loss, which is presently incalculable.

68. Thus, RPA is entitled to temporary and preliminary injunctive relief, as well as monetary damages, together with an award of attorney's fees and costs, and other relief this Court deems just and proper.

## JURY TRIAL DEMAND

RPA hereby requests a trial by jury as to all matters so triable.

## PRAYER FOR RELIEF

For the reasons set forth above, RPA respectfully requests judgment in its favor and against Dr. Scary, and prays for the following relief:

(A) A temporary restraining order and preliminary injunction:

    (i) Enjoining Dr. Scary, effectively immediately, from using or disclosing RPA's Confidential Information (as that term is defined in the Covenant Agreement);

    (ii) Requiring Dr. Scary, effectively immediately, to remove his website, https://www.thomasscarymd.com/, or to modify the website to direct all patient inquiries and communications to RPA;

    (iii) Enjoining Dr. Scary and anyone acting in concert with him, from soliciting or inducing, whether directly or indirectly, any business from any RPA Patient (as

        that term is defined in the Covenant Agreement) for the purpose of providing competitive services;

   (iv)    Enjoining Dr. Scary and anyone acting in concert with him from diverting, enticing, or otherwise taking away from RPA the business or patronage of any RPA Patient;

(B)    Compensatory damages to RPA in an amount to be determined at trial;

(C)    Attorney's fees and costs to RPA; and

(D)    Such other and further relief as this Court deems equitable and just.

Respectfully submitted by:

Dated: December 4, 2025        By:  */s/ Michael P. Avila*
                                              Michael P. Avila
                                              Gabrielle A. Giombetti
                                              Two Logan Square, 12th Floor
                                              100 N. 18th Street
                                              Philadelphia, Pennsylvania 19103
                                              mavila@fisherphillips.com
                                              ggiombetti@fisherphillips.com

                                              *Attorneys for Plaintiff*

## VERIFICATION

I, Christopher Pagnani, M.D., am Medical Director and Founder of Chris Pagnani MD PC d/b/a Rittenhouse Psychiatric Associates and I am authorized to make this verification on its behalf. I hereby verify that the factual statements contained in the Verified Complaint are true and correct to the best of my knowledge, information, and belief. I understand that a false statement here would be subject to the penalties of 18 PA. C.S. § 4904, relating to unsworn falsification to authorities.

December 4, 2025
Date Signed

By: Chris Pagnani, M.D.
Medical Director and Founder
Chris Pagnani MD PC d/b/a
Rittenhouse Psychiatric Associates